# Lehigh Valley Coal Company, Appellant, *v.* Coxe Brothers & Company, Inc., Appellant.

Argued April 13, 1937.   Before Kephart, C. J.,
Schaffer, Maxey, Drew, Linn, Stern and Barnes, JJ.

*Henry S. Drinker, Jr.,* with him *John H. Bigelow,* for appellant (No. 141) and appellee (No. 168).

*P. F. O'Neill,* with him *S. W. Rhoads,* for appellee (No. 141) and appellant (No. 168).

OPINION BY MR. JUSTICE MAXEY, June 25, 1937:

This case comes before us on cross appeals taken by both plaintiff and defendant from the holding of the court below, granting judgment for plaintiff in its claim for reimbursement for taxes paid for the years 1930 and 1931 and refusing plaintiff's claim for deficiency in payment of alleged royalties due. By agreement of the parties the case was tried by a judge without a jury.

The action is on an agreement of lease of coal lands by the lessor's successor in title against the lessee. The original lease agreement, executed on May 17, 1899, was between the Hazleton Coal Company as lessor and the Cross Creek Coal Company as lessee. This lease supplanted an earlier one made in 1882, containing a clause relating to taxes identical with that forming part of the lease in suit. By the lease of 1899, which here concerns us, the Hazleton Company demised to the Cross Creek Company all the coal in veins beneath property known as the Beaver Meadow Lands, together with the right to mine and market the same until "all the merchantable and minable coal is exhausted." Certain surface rights were also conveyed to the lessee; others were retained by the lessor. The lease provided further that the lessee should pay in addition to royalties all taxes and assessments on the fixtures and improvements erected

on the premises and used by the lessee, on the personal property connected therewith, and on the product of the mines. There was no provision regarding payment of taxes on the unmined coal.

From 1906 to 1929, inclusive, plaintiff was assessed with and paid all local taxes on the premises leased, and was duly reimbursed therefor by defendant. There was certain evidence as to what the practice had been prior to 1906 under the lease in suit and the preceding lease of 1882, but this does not clearly appear, the trial judge made no finding in respect to it, and in any event the same parties were not involved.

Royalties payable by the lessee were fixed by the lease on a per ton basis. It was expressly provided that, while no specific minimum royalty should be paid, in the actual mining operations to be conducted the proportion of minable coal in the land leased to that in other lands already under the control of and mined by Cross Creek Company (known as lands of the Tench Coxe Estate) should be preserved, or, if not, royalties should be paid on this proportion as a basis. The clause in the lease dealing with payment of royalties reads: "The tonnage mined from the lands of the Lessor shall bear the same proportion to the tonnage mined from the lands of the Tench Coxe Estate which are worked in common with this property, as the coal contents of the respective properties bear to each other, and for the purposes of this lease, it is hereby agreed that the said proportion shall be as three tons of coal of the Hazleton Coal Company to two tons of coal of the Cross Creek Coal Company, upon which basis the said Lessee hereby agrees to pay, whether the proportion as herein fixed or as hereafter adjusted shall be actually mined out and removed or not, whenever and as long as coal is being mined from lands of the Tench Coxe Estate worked in common with the demised premises; and it is distinctly agreed by and between the parties hereto that the said proportion shall be adjusted from time to time to meet

the actual circumstances of the case, if either party to this lease shall request such adjustment. And in case said Lessee shall pay at the proportion aforesaid for coal not mined and removed by it from the demised premises, it shall have the right afterwards at any time during the term of this lease to mine and remove, without payment therefor, from the demised premises, sufficient coal, at the rates provided for in this lease, to equal the coal so paid for by it but not mined and removed, and settlements on this account shall be made once in each year during the term of this lease, on the twenty-fifth days of January."

It is not expressly stated in the lease whether the proportion of three to two, above mentioned, is in reference to the product of mining operations on the two properties over separate yearly periods or, in the aggregate, over the entire term of the lease.

In 1905 the present plaintiff, Lehigh Valley Coal Company, succeeded by conveyance to all the lessor's rights in the demised premises. Meanwhile defendant's name had been changed to its present title, Coxe Brothers Coal Company, Inc. In 1905 the Lehigh Valley Railroad Company, which owned the entire capital stock of Lehigh Valley Coal Company, acquired all the stock of the defendant company. Thenceforth both plaintiff and defendant were, in substance, under common control and management; many of their officers and principal employees were the same individuals.

In July, 1921, defendant subleased to another company, an independent party, a part of the coal lands demised by the original lease, and all the coal therein contained, consisting of approximately one-quarter of all the minable coal in the entire tract. This sublease was assigned by defendant to plaintiff in February, 1925, and plaintiff released defendant from all its obligation under the lease of 1899 in respect to this portion of the lands demised. In December, 1924, while both plaintiff and defendant were still under the domination of the

Lehigh Valley Railroad Company, the 1899 lease was modified so as to increase substantially the royalties per ton payable thereunder.

Meanwhile, in 1921, by decree of the Federal Courts the intercorporate relations between plaintiff, defendant and their parent railroad company were ordered dissolved. See *United States v. Lehigh Valley R. R. Co.*, 254 U. S. 255. By court permission this was deferred until 1929. In that year the Lehigh Valley Railroad Company relinquished operating control over Coxe Brothers Coal Company to an independent management.

We will first consider plaintiff's claim for reimbursement for taxes paid by it for the years 1930 and part of 1931, the years immediately following termination of the railroad company's control of both parties. The court below found for plaintiff on this branch of the case and entered judgment in its favor for $21,644.20, with interest. As pointed out above, from 1906, the year following the establishment of common control over both companies, the taxes were paid by plaintiff and it was reimbursed for the same each year until 1930, a period of nearly a quarter of a century. During this period, and in 1930 and 1931, no complaint as to this practice was filed by defendant with plaintiff and no request for a change in the method of assessment was made. At all times defendant apparently acquiesced without question in the manner in which the payment of taxes was handled.

Under the lease agreement, as the court below held, the primary duty to pay taxes on the unmined coal in place was upon defendant. By the lease defendant took a conveyance of "all the merchantable and minable coal" until the same should be exhausted. This constituted a sale of the coal in place, irrespective of the nomenclature employed by the parties in the instrument which they executed: *Robinson v. Pierce et al.*, 278 Pa. 372, 123 A. 324; *Shoemaker, Trustee, v. Mt. Lookout Coal Co.*, 270 Pa. 432, 113 A. 410; *Millard, Exr., et al.*

*v. D., L. & W. R. R. Co.*, 240 Pa. 234, 87 A. 601; *Lehigh, etc., Coal Co. v. Wright et al.*, 177 Pa. 387, 35 A. 919; *Kingsley et al. v. Hillside C. & I. Co.*, 144 Pa. 613, 23 A. 250; *D., L. & W. R. R. Co. v. Sanderson et al.*, 109 Pa. 583, 1 A. 394; *Sanderson v. City of Scranton*, 105 Pa. 469. The only reservation in respect to the quantity to be mined was a stipulation that the lessor reserved the right to direct how much coal should remain under the surface for the support thereof and the manner of mining thereunder—necessary measures of safety for the protection of surface rights, which under the lease the lessor retained, and negligible for determination of the question of whether the parties contemplated a sale of the coal. Under the conveyance, denominated a lease, a severance of the respective interests in the land conveyed and retained was effected, and the obligation to pay taxes on the unmined coal, which was the subject of the conveyance, became prima facie that of the lessee as a matter of law: *Millard, Exr., et al. v. D., L. & W. R. R. Co.*, supra; *D., L. & W. R. R. Co. v. Sanderson et al.*, supra; *Sanderson v. City of Scranton*, supra. There was no provision in the lease which changed the lessee's obligation to pay the taxes, for the clause referred to above dealt only with taxes on fixtures and improvements and upon the coal when severed from the land.

Defendant's chief complaint, on this phase of the case, is that plaintiff's payment of taxes for 1930 and 1931 was merely voluntary on its part, without protest to the taxing authorities and without notice to defendant. It is said there was no request for payment and no endeavor on plaintiff's part to have the taxes assessed in defendant's name, in order that a reduction in amount or some adjustment could be procured. Our decision in *Millard, Exr., et al. v. D., L. & W. R. R. Co.*, supra, is cited as authority against the liability for reimbursement sought to be imposed here. We think the facts in the instant case make that case inapplicable here. For nearly a quarter of a century there was complete ac-

quiescence by defendant in the tax liability averred by plaintiff. A practice with respect to discharge of this liability grew up between the parties, sanctioned by a long course of dealing which dispensed with notice to defendant and a request for payment. This is not to be minimized because another corporation controlled them both during this period, for it cannot be presumed, nor was it shown, that the parent company interfered in any manner with the rights *inter se* of the two subsidiaries. Common control indicates nothing, one way or another, as to the duty of plaintiff to give notice or request payment, but it does not detract from the effect of the course of dealing between the parties, from which may be inferred only that both of them acquiesced in and consented to the way in which taxes were paid under the lease agreement. Nor was it shown that payment under protest, if it could have been made, or notice to and demand on defendant would have resulted in any advantage to it.

In discussing this aspect of the case, Judge COUGHLIN of the court below said: "It is true, if taxes are voluntarily paid to the public authorities, such taxes cannot be recovered back if no protest is made upon the part of the party paying, or no notice of intention to reclaim is given: *Shenango Furnace Co. v. Fairfield Twp.*, 229 Pa. 357, 78 A. 937. Where one is compelled to pay the taxes to relieve himself from liability and protect his own interest, assumpsit will lie to recover from one who should have made payment at the instance of the party paying: *Hogg v. Longstreth*, 97 Pa. 255; *Miles et al. v. D. & H. Canal Co.*, 140 Pa. 623, 21 A. 427; *Mangold v. Isabella Furnace Co.*, 31 Pa. Superior Ct. 275. Also, the fact that lessors had, without objection, paid the taxes on the coal underlying for many years, does not justify the court in construing the lease contrary to its clear and unequivocal terms. . . . And where the lessors of coal land voluntarily, with full knowledge of the facts, pay taxes, they cannot recover from the lessee, who in

fact owed them, on an implied promise to pay. But in the case at bar lessor paid them in the first instance; lessee owed them. Lessee reimbursed lessor. Thus custom followed for years the law in the case at bar. The action here is between the party paying and the party owing. By the paying of the taxes the interests of both were protected. The doing of that for the years 1930 and 1931, in the same manner as had been done theretofore, made lessor no more responsible for protest than lessee, and lessee cannot be held to be a volunteer. . . . Where payment is made under compulsion, it is not voluntary. However, there is no need of compulsion where there is acquiescence. How can one be held to compel another to do something which he willingly does and which it is his legal obligation to do? The Lehigh Valley Coal Company, lessor in this case, did so in behalf of the lessee, with the knowledge of the lessee, thus recognizing upon the part of both the legal responsibility for the payment of the taxes thereof done through the agency of the lessor."

If defendant wished to pay the taxes itself, or be notified when the same fell due, or interrupt in some material respect the settled course of dealing between the parties in the matter of tax liability under the lease, it should have notified plaintiff to that effect. Failing to do so, it cannot complain that plaintiff did only what it had always done in the past and now looks to defendant for reimbursement.

The remaining question relates to plaintiff's claim of $124,675.33 as an alleged deficiency in the payment of minimum royalties under the clause of the lease quoted above. The evidence showed that in 1899, when the lease took effect, the minable coal in the lands demised was approximately 6,300,000 tons and that in lands already operated by defendant about 4,500,000 tons. Hence, although the lease required a mining ratio of three-to-two, it was never quite practicable to maintain this ratio in coal production from the two tracts. The claim for de-

ficiency is for the years from 1924 to 1930, inclusive, during none of which was the three-to-two mining ratio preserved; since 1924, in no year has as much coal been mined from the Lehigh Valley lands, covered by the lease, as from the Coxe Estate lands, and in some years the former has been less than half the latter. To offset this, it was shown that in the majority of years from 1899 to 1930 the quantity mined from the Lehigh Valley lands was greatly in excess of the required ratio; in some years it was five times as much. If the aggregate tonnage mined from each tract is cumulated over the entire period from the beginning of the lease, we find that since 1900 the total amount of coal mined from the Lehigh Valley lands has always exceeded the ratio required by the lease. At the end of 1914 the ratio was 6.15 to 2. Since then it has gradually declined, so that at the end of 1930, even excluding the coal mined from the lands subleased to a third party, the ratio of total coal mined was 3.88 to 2; including the coal mined under the sublease, the ratio was 4.13 to 2. It was shown, and the learned trial judge found as a fact, that it was not commercially possible, as an operating problem, to mine three tons of coal from the Lehigh Valley lands to every two taken from those of the Coxe Estate. As of the end of 1930, the total minable coal remaining in the former was only 1,344,000 tons, as against 2,248,000 in the latter.

It may be pointed out that the question of the alleged deficiency in tonnage mined from the leased lands was called to the attention of plaintiff's president in 1926 by an official who was then comptroller of both parties to this suit. The former replied that while the rate of mining appeared not to have been in accordance with the lease, changed conditions would require a modification of its applicable provisions, upon request of either party, as stipulated in the lease. No adjustment of the ratio was made at that time, however, nor has since been made.

Plaintiff contends that the royalty provision in the lease meant that the mining ratio of three to two should apply to each separate annual period, since settlement in this respect, if required, was to be made every January. We do not so construe it. Nothing in the clause quoted requires such an interpretation, and to adopt it might work a substantial hardship to defendant. A time might be reached when defendant, having largely exceeded the required ratio in prior years, would find it impossible to mine in one year three tons of coal from the Lehigh Valley lands for every two taken from its other properties, and not having requested and obtained an adjustment, would be compelled to pay for coal which it could never thereafter profitably mine and thus be reimbursed for. Its only escape from such a dilemma would then be to curtail its operations on the Coxe Estate lands to the dimensions necessary to keep within the three-to-two ratio, and thus it might sustain a severe loss. The meaning contended for by defendant seems more in harmony with the intention of the parties and the practical situation with which they dealt in entering upon the lease. By this plaintiff loses nothing, for it has been paid annually for all the coal mined from its lands. In fact, since the required ratio has been exceeded in the aggregate down to the present, it has been paid even more rapidly than the parties contemplated would be the case. From the practical standpoint, all that the lessor was interested in securing was assurance that defendant would not mine its own lands to the prejudice of what the lessor might normally expect to receive as income from its own. This assurance it obtains by the construction which we here adopt. The provision for January settlements has no bearing, for this would be applicable to either of the two possible interpretations. Nor has the right to request adjustments from time to time any significance, for such adjustments might be necessitated by other considerations than the amount of minable coal remaining in either tract.

The learned trial judge held an alternative view which is equally tenable. He held that, assuming the annual ratio to apply, the sublease, made in 1921 and subsequently assigned to plaintiff in 1925, whereby one-quarter of the minable coal in the leased lands was in effect retransferred to plaintiff as of the latter date, effected a waiver by plaintiff of the condition that, as to subsequent years, the three-to-two ratio should be preserved, and that thereafter defendant was excused from performance of this condition. This was clearly correct, if plaintiff's interpretation of the ratio clause in the lease be granted. The intention of the original parties to the lease was, as it expressly states, to "preserve the proportions between the Hazleton Coal Company Coal and the Cross Creek Coal Company Coal," which was designated for the purpose of the lease as that of three to two. This condition, upon which payment of royalties was based, could be excused by a new agreement between the parties impliedly dispensing with the condition: A. L. R. Restatement of Contracts, sec. 296. It obviously became impractical, as a commercial proposition, after defendant disposed of its mining rights over one-quarter of the leased coal, to continue to apply an annual ratio of three tons to two. This resulted from new contractual dealings between the parties to the lease. It can only be inferred that thereafter the parties intended that the original provision as to the proportion of mined coal to be preserved should cease to have significance until some readjustment was effected, and that was never done. This view is confirmed by the correspondence which passed between the president of the plaintiff company and its comptroller in 1926, referred to above.

The court below did not err in denying recovery of the minimum royalties claimed, but plaintiff's claim for taxes must be sustained.

The judgment is affirmed, each party to pay the costs on its appeal.