## In re Kingston National Bank, Trustee

*Hopkin T. Rowlands*, for appellant.

*R. Lawrence Coughlin*, county solicitor, for defendant.

PINOLA, J., July 28, 1953.—This is an appeal from the assessment of coal as the property of the Kingston National Bank, trustee for a number of separate owners of the property involved, which the bank claims should be assessed against the Lehigh Valley Coal Company, to whom it had sold the coal.

The facts which are agreed to in stipulations filed present a case of first impression.

On December 1, 1929, the bank entered into a lease with that company in which it does "demise, lease and to mine let unto the said lessee, its successors and assigns, all the coal in, upon or under . . . described lands, with the sole and exclusive right to mine, remove and dispose the same. . . ."

Following provisions relative to breaker, machinery, etc., and the use of surface, appears the habendum clause:

"To Have and to Hold the premises hereby demised and privileges hereby granted unto the said Lessee, its successors and assigns, until all the merchantable coal in said premises, accessible by the ordinary and reasonable methods of mining, shall have been mined out and exhausted."

Then follow these provisions governing the mining and removal of coal:

"And the said Lessee does hereby covenant and agree to and with the said Lessor that it will enter upon the said lands and, so nearly as possible by the ordinary and reasonable methods of mining, will mine all the merchantable coal upon, in and under the same in a skillful and workmanlike manner, but the said Lessee shall not be liable for any damage or injury that can or may be caused thereby to the surface overlying the same. . . .

"It Is Specifically Understood and Agreed, however, that no further mining shall be done in either the Hillman Vein, Five Foot Vein, Four Foot Vein or Six Foot Vein upon the demised premises, where the thickness of the rock and coal in the solid overlying the said vein or veins shall be less than fifty (50) feet and that where the said rock and coal in the solid overlying the said vein or veins shall exceed fifty (50) feet in thickness the Lessee shall in its future mining in territory not heretofore mined mine all of the coal that can be mined in accordance with good mining practice, but shall not mine in excess of sixty (60) per cent of the coal in said vein or veins (except as hereinafter provided), leaving the balance of the coal in said vein or veins remaining in pillars properly distributed and columnized, except where the coal has been removed prior to September 1, 1929, and proper columnizing cannot now be done.

"Provided, however, and it is further understood and agreed, that second or pillar mining may be done by the Lessee at its option in the Four Foot Vein wherever the said rock from the top of the said Four Foot Vein to what is known as the wash shall be not less than one hundred twenty-five (125) feet in thickness; and also that second or pillar mining may be done by the Lessee at its option in the Six Foot Vein wherever the said

rock from the top of the said Six Foot Vein to what is known as the wash shall be not less than one hundred twenty-five (125) feet in thickness.

"Provided, also, and it is further understood and agreed that no second or pillar mining shall be done in either the Hillman or Five Foot Veins.

"The Lessee hereby agrees to file with the Lessor upon the execution of this Lease, tracings of each vein in the mine, showing in detail the mining that has been done prior to September 1, 1929; also a tracing showing the thickness of the rock and coal between each of the veins in the mine.

"And the said Lessee does also hereby covenant and agree to pay to the said Lessor, as hereinafter provided, for each ton of 2240 pounds of coal shipped or sent away from the demised premises, the sum of thirty (30) cents per ton for all sizes."

In short, no mining of coal is to be permitted or had in the five-foot vein or the six-foot vein where the overlying strata is less than 50 feet. Again, where solid coal is mined, 40 percent of the coal is to be left in properly distributed and columnized pillars.

In the four-foot vein, second mining can only be done where the strata to the wash is more than 125 feet in thickness.

The assessment involved is of all the coal remaining in the four-foot vein and the six-foot vein in Swoyer-ville Borough. In a companion appeal to May term, 1952. no. 455, the assessment is of the coal remaining in the top and bottom five-foot veins in Forty Fort Borough.

All of the coal assessed is such coal as may not, under the above terms of the lease, be mined, it being agreed that the conditions contemplated which prohibit mining have either occurred or exist in the veins which have been assessed to the bank.

It is also agreed by counsel that the lease conveys a fee under the law of our State and, therefore, the only question involved is one of law, whether the coal assessed is excepted from the grant.

Counsel for Luzerne County insist that it is excepted and therefore properly assessed to the bank.

Counsel for the bank argues that title to all coal passed subject only to certain restrictions as to mining.

### Discussion

There are many cases in the books in which some coal is excepted from the whole or the mining of some coal is restricted. In those cases which involve the question of liability for taxes on the coal we find no mention made nor consideration given to the coal excepted or not to be mined. Here, for the first time, we find coal excepted or coal which must not be mined assessed separately as the property of the grantor.

At first we inclined to the view of the county, but as we read the cases carefully we are constrained to conclude that the title to the coal here assessed has passed.

We know that an exception in a deed is intended to describe some part of the thing granted to which the grantor retains title and which he does not convey, or something to which another holds title already and which is not intended to be conveyed, and we know that the creation of an exception does not require the use of any particular phrase or words of art.

"No particular form is essential to an exception. Plain expression of intent to except and descriptive matter by which the subject of the exception can be identified always suffice": Mills v. Edgell, 69 W. Va. 421, 425, 71 S. E. 574; Deckenbach v. Deckenbach, 65 Ore. 160, 130 Pac. 729.

We know too that as a general rule there can be no exception by implication except in a case of necessity, so, in order for an exception to be created, it must

appear in express terms or be necessarily implied: 26 C. J. S. 445, §138.

Clearly there is no necessity in the present situation which requires that an exception be implied. If there be one in this case, it must be found in the language of the lease.

Looking at it we find, first, that the grant here is of *all of the coal*, and secondly, the habendum clause likewise deals with *all the coal*. Counsel would tack the mining restrictions to the habendum clause, thereby creating a limitation on the grant. This cannot be done. The habendum clause is complete in itself and is in language that is distinct and plain.

Other pertinent clauses indicate an intent to pass title.

On page 7 of the lease we find a requirement that the company pay an annual minimum royalty of $25,000, which minimum shall be paid "until *said coal* is exhausted or paid for." (Italics supplied.)

On page 8 there is a provision for determination by arbitration of the question whether "*all the merchantable coal* in the demised premises shall have been exhausted by actual mining thereof, or shall have been paid for by advanced royalties, although not mined, or shall have been so far exhausted or paid for as to render it impracticable to continue the payment of the minimum cash royalty provided for in this lease." (Italics supplied.)

And beginning on page 9, the parties "mutually agree": First: That the lessee shall furnish statements of coal mined and removed and the method of ascertaining the amount of such coal mined and removed therein set forth.

"Third: That the said *Lessee shall pay all taxes* which may be imposed *upon the coal* in the ground and mined, and upon all the surface. . . .

"Ninth: That the said Lessee shall have the right, after it has mined and paid for *all the coal* hereinbefore agreed to be mined and paid for," to remove buildings, machinery and improvements, etc. (Italics supplied.)

These clauses deal with all the coal, not part of it.

As we read the lease, the company took title to all the coal and it agrees to pay the taxes on all the coal, and it agreed as consideration for the whole to pay a fixed royalty only on such coal as is removed.

Just as in our case, mining was restricted in Sanderson v. City of Scranton, 105 Pa. 469. The city sought to recover taxes assessed against the coal in place which George Sanderson and others had conveyed by an agreement, alleged by the city to be merely a license or lease, to one John Jermyn.

In the agreement the owners leased to Jermyn all the coal beneath the surface of a tract of land described, excepting and reserving, however, certain specified portions necessary for the support of buildings, etc., erected on the surface.

It was expressly understood and agreed by the parties to the lease that the words *"All coal* beneath the surface . . . are intended to *include only such veins* of coal as are sufficiently remote from the surface to make the mining of them practicable and safe with regard to the preservation of the surface."

Justice Clark concluded that the instrument was a lease of all the coal beneath the surface of the tract, with the right to mine the coal and remove the same. He said (p. 474):

"It cannot be said that Jermyn owned only the coal which he mined and paid for; it is true the payments were to be according to the yield of the mine, but the consideration of the contract depended upon the quantity of coal which the mine, upon measurement, might

be found to contain, and that measurement was made as the mining progressed. . . .

"We are of opinion, therefore, that there was such a severance of the surface from the underlying strata, as created a divided ownership in these distinct portions of the land. It is the duty of the assessors in the several counties to take an account in the form directed by law, of all houses, lands, &c., and to assess and value the same at the rate or price for which they would sell, at a bona fide sale, after full public notice."

Pointing out that after the severance of surface from the underlying strata the mineral right is a distinct interest, he added:

"A mineral right is taxable as land; the owner of the surface and of the mine are each taxable, according to the value of their respective interests; where there is a divided ownership there must be a divided taxation. . . .

"It follows without stating it that the purchasers of the coal in place must pay the taxes upon it; . . ."

In Millard, Exec., et al. v. Delaware, Lackawanna & Western Railroad Co., 240 Pa. 234, costly coal was eliminated. The owners demised and to mine let all the merchantable anthracite in, upon or under described tracts, pieces or parcels of land. A subsequent clause reads as follows (p. 237):

" 'And it is understood and agreed that the parties hereto intend to embrace under the provisions of this lease all the veins of coal on said premises which are of such thickness and quality as will after paying for mining and transporting the same to the New York market, yield a profit to the said party of the second part equal to the average profit made for the time then being by the Delaware, Lackawanna and Western Railroad Company upon the coal by said company mined in the townships of Blakely and Providence in said County of Luzerne and sent to and sold in said

market. And that all veins which are not of such sufficient thickness or of such merchantable quality as that they can be thus profitably worked by the said party of the second part, his heirs, executors, administrators or assigns, are not to be considered embraced in this lease nor required to be worked under the same'."

The court held that the agreement constituted a sale of the coal in place and that the lessee was chargeable with the taxes on the coal in place, although it was intended that the provisions of the lease applied only to the veins of coal which yielded a profit when sold in the New York market equal to the profit which the railroad company made upon other coal mined from the same locality.

Justice Mestrezat declared (p. 241):

"There is no substantial difference between the lease in the present case and those in Delaware, Lackawanna and Western Railroad Company v. Sanderson, 109 Pa. 583, and kindred cases. It follows that the defendant company being the owner of the minerals was chargeable with the taxes unless it was otherwise agreed in the lease."

A recent case in which the provisions of the agreement are similar to those before us is Lehigh Valley Coal Company v. Coxe Brothers & Company, Inc., 327 Pa. 23.

There the lease was of all the coal in veins beneath property known as the Beaver Meadow lands, together with the right to mine and market the same until "all the merchantable and minable coal is exhausted". Certain surface rights were retained by the lessor.

The lease provided that the lessee should pay, in addition to royalties, all taxes and assessments on the fixtures and improvements erected on the premises and used by the lessee, on the personal property con-

nected therewith, and on the product of the mines. There was no provision regarding payment of taxes on the unmined coal. The court held that the duty to pay devolved upon the lessee.

The lease in question provided, inter alia: (a) That while the lessor was responsible for any damages that may be caused by mining to the surface, the lessor reserved the right to direct how much coal shall remain underneath the surface for the support thereof and the manner of mining the coal thereunder; (b) that the lessee was to leave such pillars and support of coal along gangways and elsewhere as to the agents or officers of the lessor should be considered necessary for the security of the mine, and (c) where seams or stripping could not be mined, prepared and sold at a profit, then such seams were to be considered exhausted and were to be withdrawn from the operation of the lease with the same effect in all respect as if the said seams and all the estate, right, title and interest of the lessee had been surrendered to the lessor.

Chief Justice (then Justice) Maxey declared (p. 28):

"Under the lease agreement, as the court below held, the primary duty to pay taxes on the unmined coal in place was upon defendant. By the lease defendant took a conveyance of 'all the merchantable and minable coal' until the same should be exhausted. This constituted a sale of the coal in place, irrespective of the nomenclature employed by the parties in the instrument which they executed. (Citing many cases, including Sanderson v. City of Scranton, 105 Pa. 469). *The only reservation in respect to the quantity to be mined was a stipulation* that the lessor reserved the right to direct how much coal should remain under the surface for the support thereof and the manner of mining thereunder—necessary measures of safety for the protection of surface rights,

which under the lease the lessor retained, and *negligible for determination of the question of whether the parties contemplated a sale of the coal.* Under the conveyance, denominated a lease, a severance of the respective interests in the land conveyed and retained was effected, and the obligation to pay taxes on the unmined coal, which was the subject of the conveyance, became prima facie that of the lessee as a matter of law: Millard, Exr., et al. v. D., L. & W. R. R. Co., supra; D., L. & W. R. R. Co. v. Sanderson et al., supra; Sanderson v. City of Scranton, supra. There was no provision in the lease which changed the lessee's obligation to pay the taxes, for the clause referred to above dealt only with taxes on fixtures and improvements and upon the coal when severed from the land."

In Union Trust Co. of Pittsburgh v. Bellman et al., 300 Pa. 234, a brick company executed a mortgage to plaintiff to secure payment of bonds. It contained a stipulation reserving to the executors of the estate of Margaret Plumer, "all the coal that may underlie said above described land, with right to mine and remove the same, having first obtained the consent of the Kensington Brick Company, party of the first part hereto".

Justice Walling said (p. 237):

"By the plain terms of the reservation, the title to the coal remained or vested in the Plumer estate. The effect of the reservation was to except the coal from the mortgage. . . . The title thereto was not destroyed by the clause requiring the consent of the brick company to its removal any more than the title to land would be defeated by a building restriction thereon. See Harmon v. Burow, 263 Pa. 188. While the restriction as to the mining was valid, it did not affect the title to the coal. See Electric City Land, etc., Co. v. Coal Company, 187 Pa. 500; also Acheson v. Stevenson, 146 Pa. 228. This restriction as to the mining was

doubtless inserted so that the excepted coal might not be removed in any manner which would interfere with the operations of the brick company. It was a *limitation on the right of removal*, not a destruction of the title."

In our case we have coal which may not be mined as the result of a limitation on the right of removal intended to protect either the surface or current mining operations.

In Commonwealth v. Fisher, 364 Pa. 422, Mr. Justice Stearne, in a dissenting opinion, pointed out that (p. 434):

" 'There is a distinction between ownership of minerals and mining rights. Carlin v. Chappel, 101 Pa. 348. Parties may own all of the minerals . . . and still not be able to remove all of them due to a limitation on the mining rights'."

Here we have such a situation.

From the agreed facts we reach the following

### Conclusions

1. Title to the coal assessed to the Kingston National Bank, trustee, passed to the Lehigh Valley Coal Company under the lease in question.

2. The assessment against the bank is illegal.

Accordingly, we enter the following

### Order

Now, July 28, 1953, the appeal of the Kingston National Bank, trustee, in the above case is sustained, and the assessment of the coal in the Borough of Swoyerville from which this appeal is taken is set aside.

The prothonotary will enter this order and notify counsel, and if no exceptions are filed thereto within 10 days from the receipt of said notice, it will become final.